# EXHIBIT D

**WRONKO LOEWEN BENUCCI**
Michael Poreda, Esq. (025492010)
69 Grove Street
Somerville, NJ 08876
Telephone: (908) 704-9200
Fax: (908) 704-9291
e-Mail: poreda@poredalaw.com
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| EDWIN POLYNICE,<br><br>*Plaintiff*,<br><br>vs.<br><br>NEW JERSEY DEPARTMENT OF CORRECTIONS, ADMINISTRATOR GEORGE ROBINSON, SERGEANT GIBSON, S.C.O. JOHN DOE, RUTGERS UNIVERSITY – UNIVERSRITY CORRECTIONAL HEALTH CARE ("UCHC"), LATIFA FEDAI, APN, UCHC JOHN DOES 1-20, DOC JOHN DOES 1-10,<br><br>*Defendants*. | Docket No. 2:19-cv-16875-MCA-LDW<br><br><u>Civil Action</u><br><br>**AMENDED COMPLAINT** |

Edwin Polynice, by way of this Amended Complaint hereby brings the following action against the Defendants as follows:

## JURISDICTION AND VENUE

1.) This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the question arises under the laws and Constitution of the United States.

2.) This Court has jurisdiction over state law claims herein presented pursuant to 28 U.S.C. § 1367 because the claims are part of a case over which the court has federal question jurisdiction.

3.) Venue is properly laid in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) because all relevant events took place in New Jersey.

## PARTIES

4.) Plaintiff Edwin Polynice is a resident of New Jersey whose date of birth is November 15, 1978. He was in the custody of the New Jersey Department of Corrections from June 2012 until August 2020. His SBI number was 864138C. He last resided at South Woods State Prison, 215 South Burlington Road, Bridgeton, NJ 08302. Due to the recent award of eight months of public health emergency credits, Polynice was just released from prison.

5.) Defendant New Jersey Department of Corrections is a New Jersey State agency headquartered at Whittlesey Road, Trenton, NJ 08625.

6.) Newly added Defendant Rutgers University – University Correctional Health ("UCHC") care is a corporate entity headquartered at 7 College Avenue, New Brunswick, NJ 08901. UCHC is the medical contractor that provides medical services to inmates within the custody of the New Jersey Department of Corrections.

7.) Newly added Defendant Latifa Fedai, APN is a nurse practitioner at Northern State Prison, 168 Frontage Road, Newark, NJ 07114.

8.) Defendant George Robinson is currently the Administrator of the Adult Diagnostic and Treatment Center, a prison facility operated by the New Jersey Department of Corrections. At the times relevant to this complaint, he was the Administrator of Northern State Prison, P.O. Box, 2300, 168 Frontage Road, Newark, NJ 07114. He is an employee of the New Jersey Department of Corrections.

9.) Defendant Sergeant Gibson, on information and belief, is that name of the correctional sergeant who, on September 30, 2017, was responsible for overseeing the inmates living

        in Delta Unit 1-E at Northern State Prison. Sergeant Gibson is an employee of Defendant New Jersey Department of Corrections.

10.) Defendant S.C.O. John Doe was an NJ DOC correctional officer employed at Northern State Prison on September 30, 2017.

11.) Newly added Defendants UCHC John Does 1-20 are employees of UCHC, including nurses, doctors, and supervisors.

12.) Newly added Defendants DOC John Does 1-20 are employees and supervisors of the DOC.

## FACTS

13.) Plaintiff is known to have diabetes, diabetic neuropathy in his feet, as well as a history of a torn Achilles tendon. These disabilities substantially limit his activities of daily living, to wit, his ability to climb, jump, and maintain balance.

14.) These disabilities are therefore within the meaning of "disabilities" as the term is used in the New Jersey Law Against Discrimination, the Rehabilitation Act, and the Americans with Disabilities Act.

15.) Due to Plaintiff's disabilities, he was given a permanent bottom bunk restriction in 2013, when he arrived at South Woods State Prison.

16.) Plaintiff often experienced dizziness from fluctuations in blood sugar due to the diabetes. The bottom bunk restriction served to protect him during dizzy spells.

17.) The bottom bunk restriction was also in place to accommodate the fact that his neuropathy and Achilles tendon tear made it difficult for him to climb and jump.

18.) In January 2017, he was transferred to Northern State Prison, after having spent several months in New Jersey State Prison.

19.) Plaintiff requested the continuation of his standing bottom bunk order due to his diabetes-induced dizziness, neuropathy in his feet, and Achilles tendon tear.

20.) This was denied without genuine cause by Latifa Fedai, APN on January 24, 2017. This was supposedly based on Polynice "not meeting the requirements," however she never articulated the requirements to him, and future acts by UCHC employees would prove that this was a sadistic and deliberate lie.

21.) Plaintiff formally grieved the denial of the bottom bunk through the Kiosk system at Northern State Prison, but his grievance was denied.

22.) Plaintiff therefore exhausted his administrative remedies.

23.) Plaintiff was nevertheless able to secure a bottom bunk informally.

24.) On September 30, 2017, Plaintiff was living in Delta Unit 1-E at Northern State Prison, assigned to a bottom bunk.

25.) For unknown reasons, on September 30, 2020, Plaintiff was told by S.C.O. John Doe to move out of his bottom bunk and move to cell 104 and sleep in a top bunk.

26.) Polynice told S.C.O. John Doe that he needed to be on the bottom bunk due to his disabilities.

27.) When S.C.O. John Doe protested that Polynice was no longer entitled to the accommodation, Polynice told him that the accommodation was for the remainder of his incarceration.

28.) Plaintiff's right to a safe place to sleep is clearly established law. N.J.A.C. 10A:31-3.6 states: "A qualified inmate with a disability shall be housed in a manner that provides for his or her safety, security and accessibility to facility programs or activities. Rooms, sleeping units, or housing units shall be designed for use by qualified inmates with disabilities."

29.) Following his explanation, Polynice was ordered to utilize the top bunk, in clear violation of DOC regulation, state law, and federal law.

30.) S.C.O. John Doe reiterated that this order had come from Sergeant Gibson.

31.) Polynice was compelled to follow the order.

32.) On October 1, 2017, at approximately 12:35pm, while attempting to dismount the top bunk to take a daily shower, Plaintiff Edwin Polynice became extremely dizzy from a drop in his blood sugar and fell.

33.) During this fall, Plaintiff, Edwin Polynice attempted to land on a stool, but slipped. He fell, striking his head on the toilet and his leg against the stool.

34.) Post-fall, Mr. Polynice sustained severe injuries leading to thirteen stitches and five staples.

35.) Mr. Polynice also suffered a dislocated shoulder, severe neck pain, and bruising on his legs.

36.) Plaintiff, Edwin Polynice, required an extended stay in the prison infirmary for ten days due to these injuries.

37.) Throughout his time in the infirmary, he experienced debilitating headaches with the pain extending throughout his entire head, chronic pain in his facial area, ongoing dizziness, and a bruised leg.

38.) On October 20, 2017, Dr. Sandra Connolly, recognizing the obvious misdeed of Fedai, ordered Polynice back to a bottom bunk restriction.

39.) Plaintiff, Edwin Polynice continued to experience constant neck pain, headaches, and lower back pain while he remained incarcerated.

40.) Despite the ongoing pain, Plaintiff was never given any treatment or diagnostic other than Tylenol.

41.) Now released from prison, Plaintiff will be forced to spend money, in excess of $3,500, to treat his injuries.

42.) Additionally, Plaintiff has suffered disfigurement, in the form of significant scarring from his fall.

43.) He has also permanently lost full mobility as a result of the fall.

44.) Plaintiff also developed renal insufficiency while incarcerated, a complication of diabetes and high blood pressure that were also not treated appropriately.

45.) In 2020, near the end of Plaintiff's incarceration, Plaintiff suffered kidney failure, in part, due to UCHC continuing to rely on NSAID's to treat his pain, even though they knew the NSAIDs were ineffective.

46.) As explained further below, the provision of NSAIDs was a tool to avoid liability by trying to show the pretense of medical treatment, when in fact, they knew the treatment

was ineffective and was put Plaintiff at heightened risk of damage to his internal organs, particularly in his case, his kidneys.

### STATEMENT ON COMPLIANCE WITH NOTICE OF TORT CLAIM RULES

47.) On or about December 19, 2017, Plaintiff, or his then-counsel, Jean Ross, filed a Notice of Tort Claim seeking $100,000 for the injuries sustained in the fall.

### COUNT 1
### 42 U.SC. § 1983 – EIGHTH AMENDMENT – DELIBERATE DIFFERNECE TO INMATE SAFETY –AGAINST UNIVERSITY CORRECTIONAL HEALTH CARE, GEORGE ROBINSON, SGT. GIBSON, S.C.O. JOHN DOE, LATIFA FEDAI, DOC JOHN DOES 1-20, UCHC JOHN DOES 1-20.

48.) The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

49.) When Latifa Fedai denied Plaintiff the right to a bottom bunk because he "didn't qualify," she knew that was not true. This was done out of a cruel and sadistic intent to cause Plaintiff pain and expose him to injury.

50.) The falseness of her statement that he "didn't qualify" is proven by the fact that Dr. Connolly gave Plaintiff a bottom bunk even though he had the same diabetes, diabetic neuropathy, and torn Achilles tendon before the fall that he did after the fall.

51.) Fedai knew that Plaintiff's conditions made him a fall risk.

52.) Fedai's decision had nothing to do with requirements or medical judgment. This was an act of deliberate indifference to Plaintiff's safety.

53.) In the alternative, Fedai was directed or pressured to say this by a policy, practice, or custom of UCHC which pressured or directed employees not to give bottom bunk passes to inmates, even when the inmates presented with a real safety issues.

54.) Because it is so difficult for injured inmates to find an attorney and sue for injuries suffered by the intentionally deficient practice of medicine, providing sub-standard care is a deliberate part of UCHC's business model.

55.) The chances of being successfully sued for each inmate injury are so low that UCHC simply considers the lawsuits a cost of doing business.

56.) In the alternative, UCHC John Does 1-20 were directly responsible for issuing policies that went against Fedai's own medical judgment and required her to deny Plaintiff a bottom bunk even though the need was obvious from his medical history.

57.) In the alternative, DOC John Does and George Robinson were responsible for articulating and maintaining the policies and practices that suppressed the medical judgment of UCCH's employees.

58.) In the alternative, SCO John Doe knew that Plaintiff had the right to a bottom bunk and that the top bunk presented a danger to Plaintiff's safety, and yet he ordered Plaintiff to the top bunk in spite of the threat to inmate safety.

59.) In the alternative, Sgt. Gibson, when questioned about Plaintiff's need for a bottom bunk by SCO John Doe, ordered SCO John Doe to place Plaintiff in a top bunk despite Sgt. Gibson's knowledge of the threat to Plaintiff's safety.

60.) George Robinson and DOC John Does 1-20, who are other policymakers, developed policies, procedures and/or customs which caused the deprivation of Plaintiff, Edwin Polynice's constitutional rights.

61.) Said policies were inherently deficient, or inappropriate as formulated, as to the adherence of mandated medical care provided to an inmate that presented with documented medical issues.

62.) UCHC John 1-20 were employees of UCHC who received Plaintiff's complaints about continuing and constant pain is head, neck, and back for years after his fall, who did nothing but provide him ineffective Tylenol over and over.

## COUNT 2
## NEGLIGENCE AGAINST UNIVERSITY CORRECTIONAL HEALTH CARE

63.) Employees of University Correctional Health Care failed to provide standard care to Plaintiff when they took away his bottom bunk restriction.

64.) A thorough review of Plaintiff's condition, or and/or listening to his complaints, would have been standard medical care, and doing so would have revealed that Plaintiff was in fact "qualified" for a bottom bunk restriction.

65.) But for the negligence of UCHC's employees, Plaintiff would not have suffered his fall and consequent physical injuries.

66.) UCHC's failure to treat Plaintiff's pain after the fall with anything more than totally ineffective Tylenol was sub-standard care for chronic pain.

67.) The constant provision of Tylenol and other NSAID's that were ineffective was sub-standard because those medications can cause organ damage with long-term use, and given that they did nothing to help, the continued use of NSAID's to "treat" the pain was patently sub-standard care.

68.) But for UCHC's sub-standard care of Plaintiff's chronic pain, the source of the problem would have been discovered, and his suffering could have been alleviated, and his kidneys would not have been damaged.

69.) UCHC's continued reliance on NSAID's to "treat" his pain worsened Plaintiff's renal insufficiency and contributed to his kidney failure.

## COUNT 3
## 42 U.SC. § 1983 – EIGHTH AMENDMENT – DELIBERATE DIFFERNECE TO A SERIOUS MEDICAL NEED –AGAINST UNIVERSITY CORRECTIONAL HEALTH CARE AND UCHC JOHN DOES 1-20.

70.) After a few months had gone by, with Plaintiff's pain unremitting and intractable with NSAIDs such as Tylenol, Plaintiff's chronic condition became a serious medical need.

71.) Despite knowledge of this, John Does 1-20 did nothing to diagnose or treat Plaintiff.

72.) This alone spells out deliberate indifference to a serious medical need.

73.) However, the deliberate indifference continued by John Does 1-20 as they continued to prescribe him NSAIDs that they knew were ineffective and put him at needless risk for organ damage.

74.) This was even more outrageous given that John Does 1-20 knew the risks of this were escalated by Plaintiff's renal insufficiency.

75.) John Does 1-20 were directed to continue giving Plaintiff NSAIDs, despite their known ineffectiveness, due to a policy, practice, or custom at UCHC of treating chronic pain as though it were acute pain, even when the NSAIDs do not help the chronic pain.

76.) This is a deliberately indifferent custom designed simply to try to avoid the higher medical costs associated with diagnosing and treating chronic pain and also as a ploy to avoid liability for deliberate indifference.

77.) UCHC provides medicines it knows are futile to create the pretense of medical care, when in fact, they know, not only that it is futile, but that it puts inmates at unnecessary risk of organ damage.

## COUNT 4
### NEGLIGENCE AGAINST ALL DOC DEFENDANTS

78.) If not reckless, intentional, or deliberately indifferent to inmate safety, the decision to place Plaintiff in the top bunk was negligent.

79.) But for the exercise of due care to listen to Plaintiff's truthful pleading that he was bottom-bunk restricted due to his health issues, Plaintiff would not have suffered permanent injuries.

80.) Had Defendants exercised due care, they would have placed Plaintiff in a bottom bunk, and he would not have fallen even if he had an attack of low blood sugar.

81.) The failure to exercise due care proximately resulted in Plaintiff's permanent injuries.

82.) The failure to exercise due care was the fault of S.C.O. John Doe, Sergeant Gibson, John Does 1-20, and/or George Robinson.

83.) The Department of Corrections is liable on the theory of respondeat superior for the negligence of its employees.

## COUNT 5
### NEW JERSEY LAW AGAINST DISCRIMINATION – FAILURE TO ACCOMMODATE A DISABILITY AGAINST ALL DEFENDANTS

84.) Plaintiff was a person with a disability, namely his diabetes and his Achilles tendon tear.

85.) The New Jersey Law Against Discrimination entitles Plaintiff to reasonable accommodations that would give him a safe place to sleep.

86.) Defendants denied Plaintiff access to a bottom bunk.

87.) Use of a bottom bunk was a reasonable accommodation.

88.) The denial of the reasonable accommodation caused Plaintiff permanent injuries.

## COUNT 6
## AMERICANS WITH DISABILITIES ACT
## AGAINST ALL DEFENDANTS

89.) The Americans with Disabilities Act has three titles. Title II ensures that people with disabilities have access to public services and programs. Title III assures access to places of public accommodation.

90.) Prisons, and all the features therein are included within the scope of Title II and III as "places of public accommodation" and "public services and programs."

91.) Plaintiff was a "qualified individual" under the ADA by virtue of being inside the prison and needing a safe and appropriate place to sleep.

92.) Plaintiff's diabetes and Achilles tendon tear were "disabilities" under the ADA because they are physical impairments which substantially interfere with activities of daily living such as climbing, jumping, and maintaining his balance.

93.) Plaintiff's physical limitations could have easily been remedied by placing him on a bottom bunk.

94.) It was the Defendants' responsibility to have these accommodations ready for prisoners, like Plaintiff, with significant mobility problems.

95.) This denial caused Plaintiff permanent injuries.

## COUNT 7
## REHABILITATION ACT AGAINST ALL DEFENDANTS

96.) Like the Americans with Disabilities Act, the Rehabilitation Act also requires prisons to provide inmates with disabilities reasonable accommodations so that they can access all the programs, services, and activities of the prison.

97.) The substantive standards for liability under the Rehabilitation Act are the same as under the Americans with Disabilities Act.

98.) The DOC Defendants are liable to Plaintiff under the Rehabilitation Act based upon the same facts recited in the Fourth Claim for Relief above.

## COUNT 8
## NEW JERSEY LAW AGAINST DISCRIMINATION AGAINST ALL DEFENDANTS

99.) Like the Americans with Disabilities Act and Rehabilitation Act, the New Jersey Law Against Discrimination also requires prisons to provide inmates with disabilities reasonable accommodations so that inmates can use all the facilities with safety and dignity.

100.) However, the definition of "disability" under the LAD is broader, and includes any physical illness or disease, or any physical injury that prevents the normal exercise of any bodily or mental functions or 2) can be shown to exist through clinical or diagnostic tests.

101.) Plaintiff had a disability, namely diabetes and a torn Achilles tendon.

102.) The refusal to reasonably accommodate his disabilities by providing him with a low bunk proximately led to Plaintiff's injuries.

103.) Failure to exhaust administrative remedies is not a defense under the LAD.

## COUNT 9
## NEGLIGENT TRAINING AND SUPERVISION AGAINST NEW JERSEY DEPARTMENT OF CORRECTIONS

104.) DOC John Does 1-20 and/or Sergeant Gibson had a duty to train SCO John Doe and/or Sergeant Gibson in the proper handling of prisoners with disabilities, especially disabilities that might not be visible.

105.) DOC John Does 1-20 and/or Sergeant Gibson failed to train SCO John Doe and/or Sergeant Gibson in the proper handling of prisoners with disabilities, especially disabilities that might not be visible.

106.) Bur for this failure to train, Plaintiff would not have sustained his permanent injuries.

107.) DOC John Does 1-20 and/or Sergeant Gibson had a duty to supervise the transfer of Plaintiff from his bottom bunk to cell 104.

108.) DOC John Does 1-20 and/or Sergeant Gibson failed to properly supervise the transfer of Plaintiff from his bottom bunk to cell 104.

109.) Had the Defendants properly supervised Plaintiff's cell transfer he would have been assigned to a bottom bunk or else left in his original cell.

110.) But for the negligent failure to supervise Plaintiff's transfer out of his original cell, Plaintiff would not have sustained his permanent injuries.

111.) The Department of Corrections is liable *respondeat superior* for the negligent training and supervision of its staff.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, and each of them, for compensatory and punitive damages, counsel fees, and all costs of suit.

**WHEREFORE**, the class whom Plaintiff represents demands injunctive relief, along with counsel fees and costs of suit.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

MICHAEL POREDA, ESQ.
*Attorney for Plaintiff*

Date: December ___, 2020

## NOTICE OF TRIAL COUNSEL

**PLEASE TAKE NOTICE** that Michael Poreda, Esq. is hereby designated as Trial Counsel in the above-captioned matter.

Michael Poreda, Esq.
*Attorney for Plaintiff*

Date: December ____, 2020

## CERTIFICATION OF NO OTHER ACTION

Pursuant to Rule 4:5-1, it is hereby certified that to the best of my knowledge and belief, there are no other pending actions or proceedings involving the matter in controversy, none are contemplated, and I do not presently know the identity of any other party who should be joined.

Michael Poreda, Esq.
*Attorney for Plaintiff*

Date: December ____, 2020